IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  09-cv-03024-CMA-KLM

DONALD GARCIA,

      Plaintiff,

v.

BRIAN WEBSTER, physician's assistant,
KEVIN MILLYARD, warden,
STOCK, physician's assistant,
GOLDEN, doctor, and
FORTUNATO, doctor, All Defendants in Their Official and Individual Capacities,

      Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN  L. MIX**

This matter is before the Court on Defendant Brian Webster's **Motion to Dismiss Complaint** [Docket No. 27; Filed May 21, 2010] and the remaining Defendants' **Motion to Dismiss Complaint** [Docket No. 20; Filed March 15, 2010] (collectively, the "Motions to Dismiss").  On July 14, 2010, Plaintiff, who is proceeding *pro se*, filed a Response to Court's Order to Show Cause [Docket No. 32] (the "Response").  The Court construes Plaintiff's Response as a response in opposition to the Motions to Dismiss.  Defendants did not file a reply.  Pursuant to 28 U.S.C. § 636(b)(1)(A) and D.C.COLO.LCivR 72.1C., the Motions to Dismiss have been referred to this Court for a recommendation regarding disposition.  The Court has reviewed the Motions to Dismiss [#20 and 27], Plaintiff's Response [#32], the entire case file, and the applicable law and is sufficiently advised in

-1-

the premises.  For the reasons set forth below, the Court respectfully **RECOMMENDS** that the Motions to Dismiss be **GRANTED**.

## I.  Summary of the Case

Plaintiff is an inmate at the Colorado Department of Corrections ("CDOC") Sterling Correctional Facility ("Sterling").  On December 30, 2009, Plaintiff filed a Complaint [Docket No. 3] alleging that the rights guaranteed to him by the Eighth Amendment to the United States Constitution were violated by Defendants.  *Complaint* [#3] at 6.  Plaintiff alleges that Defendants violated his rights by responding with deliberate indifference to his "serious medical need" for diagnosis and treatment of "back pain so severe [that] it cause[d] him trouble walking" and caused him to fall down.[1]  *Id.* at 6.  Plaintiff explains that he began complaining to Defendants of "back pain so severe [that] it made [him] limp noticeably" in March 2007.  *Id.* at 4.  He alleges that Defendants denied him proper medical treatment, provided him with harmful advice about his condition, and told him that he "was faking it." *Id.*  He further alleges that he was not taken to see a specialist until May 2008.  *Id.*

Plaintiff alleges the following treatment history.  On or about March 14, 2007, Plaintiff was seen by Defendant Stock, a physician's assistant at Sterling.  *Id.* at 6.  Defendant Stock advised Plaintiff that he was suffering from "a muscle pinching a nerve," and he prescribed Motrin.  *Id.*  Approximately two weeks later, Defendant Stock administered a cortisone shot to relieve swelling in Plaintiff's back and to decrease Plaintiff's pain and limp. *Id.*  Approximately two weeks after the cortisone shot, Plaintiff was seen by Defendant

---

[1] Plaintiff also alleges several derivative medical needs: (1) diagnosis and treatment of seizures, *Complaint* [#3] at 7; (2) diagnosis and treatment of and assistive devices for "trouble keeping balance and walking," *id.*; (3) diagnosis and treatment of loss of strength and dexterity in the left hand, *id.* at 11; and (4) problems defecating, *id.*

Webster, another physician's assistant at Sterling.  *Id.*  Defendant Webster administered a second cortisone shot and a steroid shot.  *Id.*  Defendant Webster also advised Plaintiff to "walk it out."  *Id.*  Plaintiff's pain and limp worsened, and around May 20, 2007, he submitted a request to see medical staff at Sterling.  *Id.*  Plaintiff was not allowed to see Defendant Webster until sometime in June 2007.  *Id.* at 6, 8.  During that appointment, Defendant Webster administered a pain killer and muscle relaxer.  *Id.* at 8.  Defendant Webster advised Plaintiff "to increase [his] time walking on the yard because there was nothing really wrong with [him]."  *Id.*

Plaintiff's condition did not improve, and sometime in July 2007, he requested to see a doctor instead of a physician's assistant.  *Id.*  Plaintiff was not permitted to see a doctor.  *Id.*  Instead, he had another appointment with Defendant Webster sometime in August 2007.  *Id.*  At this appointment, Defendant Webster advised Plaintiff that he would not provide any different medications.  *Id.*  Defendant Webster told Plaintiff "to keep walking the yard because there was nothing wrong with [him]."  *Id.*  Defendant Webster also told Plaintiff that he "was faking."  *Id.*

Throughout September 2007, Plaintiff's condition worsened.  *Id.*  Plaintiff sought help from his sister, Carol Capuano.  *Id.*  Ms. Capuano telephoned several CDOC officials, including Defendant Milyard, in an effort to secure better medical attention for Plaintiff.  *Id.*  She "got no results from her conversations . . . until she threatened to sue."  *Id.*  Ultimately, Plaintiff was allowed to see Defendant Webster again in November 2007.  *Id.*  At that appointment, Defendant Webster referred Plaintiff to Defendant Goldsmith, a doctor at Sterling.  *Id.*  Defendant Goldsmith prescribed Baclofen to treat Plaintiff's condition.  *Id.*

Baclofen "did not help anymore than Motrin," and Plaintiff's condition deteriorated

to the point where he could "barely walk and [his] leg could not accomplish a normal range of motion." *Id.* Plaintiff returned to Defendant Goldsmith in December 2007, and Defendant Goldsmith ordered magnetic resonance imaging (MRI). *Id.* Plaintiff underwent MRI in January 2008 at Sterling. *Id.* After reviewing Plaintiff's MRI results, Defendant Goldsmith arranged for Plaintiff to have an appointment with a specialist at Denver Health on March 8, 2008. *Id.* at 8-9. When Plaintiff arrived for his appointment, the specialist refused to see him because the CDOC staff who transported him to the appointment failed to bring his medical files. *Id.* at 9. In April 2008, Plaintiff submitted a request to Sterling staff "stating that [he] couldn't walk on [his] own and requesting crutches." *Id.*

On May 2, 2008, Plaintiff saw a specialist at Denver Health. *Id.* The specialist ordered MRI and a computed tomography (CT) scan. *Id.* These diagnostic tools revealed that Plaintiff had a growth on his spinal cord. *Id.* On May 15, 2008, Plaintiff underwent surgery to remove the growth. *Id.* Plaintiff asserts that the surgery was unreasonably delayed. *See id.* at 3 ("After the surgery was ordered I still had to wait days for it to be actually done allowing more time for growth."). Finally, Plaintiff alleges that he was denied appropriate follow-up treatment during his recovery from the surgery. *Id.* at 4-5; *see id.* at 7 (detailing allegations that Defendants Webster and Fortunato denied Plaintiff "necessary rehabilitative therapy and equipment"). Plaintiff concludes that "[t]he delay in diagnosis and treatment as well as the delay in surgery and lack of rehabilitative therapy caused and continue to cause severe pain and suffering and irreversible physical damage." *Id.* at 5.

Plaintiff seeks three types of relief: (1) prospective "injunctive relief ordering proper medical care and rehabilitation"; (2) declaratory relief stating that his constitutional rights were violated; and (3) compensatory damages for physical pain and suffering, permanent

bodily injury, and "emotional and mental pain and suffering." *Id.* at 12.

The Motions to Dismiss [#20 and 27] filed by Defendants seek dismissal of Plaintiff's Complaint [#3] pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6). Defendants contend that dismissal is appropriate for the following reasons: (1) they are immune from liability for damages in their official capacities; (2) Plaintiff's claims against Defendants Webster and Stock are barred by the statute of limitations; (3) Plaintiff failed to allege that Defendant Milyard personally participated in the alleged Eighth Amendment violations; (4) Plaintiff failed to state an Eighth Amendment claim against Defendants Webster, Stock, Goldsmith, and Fortunato; and (5) Defendants are entitled to qualified immunity in their individual capacities.

## II.  Standard of Review

The purpose of a motion to dismiss pursuant to Rule 12(b)(1) is to test whether the Court has jurisdiction to properly hear the case before it. Because "federal courts are courts of limited jurisdiction," the Court must have a statutory basis to exercise its jurisdiction. *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002); Fed. R. Civ. P. 12(b)(1). Statutes conferring subject-matter jurisdiction on federal courts are to be strictly construed. *F & S Const. Co. v. Jensen*, 337 F.2d 160, 161 (10th Cir. 1964). "The burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction." *Id.* (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

A motion to dismiss pursuant to Rule 12(b)(1) may take two forms: facial attack or factual attack. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). When reviewing a facial attack on a complaint, the Court accepts the allegations of the complaint as true. *Id.* By contrast, when reviewing a factual attack on a complaint, the Court "may not

presume the truthfulness of the complaint's factual allegations." *Id.* at 1003.  With a factual attack, the moving party challenges the facts upon which subject-matter jurisdiction depends.  *Id.*  The Court therefore must make its own findings of fact.  *Id.*  In order to make its findings regarding disputed jurisdictional facts, the Court "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing."  *Id.* (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990); *Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir.), *cert. denied*, 484 U.S. 986 (1987)).  The Court's reliance on "evidence outside the pleadings" to make findings concerning purely jurisdictional facts does not convert a motion to dismiss pursuant to Rule12(b)(1) into a motion for summary judgment pursuant to Rule 56.  *Id.*

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); Fed. R. Civ. P. 12(b)(6) (A complaint may be dismissed for "failure to state a claim upon which relief can be granted.").  To withstand a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'"  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) ("The complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations." (quoting *Twombly*, 550 U.S. at 570)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. __ , 129 S.

Ct. 1937, 1949 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotations omitted). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted).

When considering Plaintiff's Complaint [#3], the Court is mindful that it must construe the filings of a *pro se* litigant liberally. *See Haines v. Kerner*, 404 U.S. 594, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, the Court should not be the *pro se* litigant's advocate, nor should the Court "supply additional factual allegations to round out [the *pro se* litigant's] complaint or construct a legal theory on [his or her] behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (citing *Hall*, 935 F.2d at 1110). In addition, *pro se* litigants must follow the same procedural rules that govern other litigants. *Nielson v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994).

### III.  Analysis

In this case, Defendants' Motions to Dismiss [#20 and 27] mount a facial attack on Plaintiff's Complaint [#3] pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6). Accordingly, the Court accepts the facts alleged in the Complaint as true for the purpose of resolving the Motions to Dismiss. *See Holt*, 46 F.3d at 1002; *Mobley*, 40 F.3d at 340; *Defendant Webster's Motion to Dismiss* [#27] at 1 and *Other Defendants' Motion to Dismiss* [#20] at 2 (both stating that the facts alleged in the Complaint "are accepted as true for the sole

purpose of this Motion").  Defendants contend that the Complaint should be dismissed because (A) the Court lacks subject-matter jurisdiction to adjudicate Plaintiff's claims against them in their official capacities, and (B) Plaintiff's remaining claims are not facially plausible.  The Court addresses Defendants' contentions in turn.

### A.    Lack of Subject-Matter Jurisdiction

Pursuant to Fed. R. Civ. P. 12(b)(1), Defendants contend that the doctrine of sovereign immunity bars the Court from exercising subject-matter jurisdiction over Plaintiff's claims against them in their official capacities.  *See Complaint* [#3] at 1 (stating that claims are asserted against "all Defendants in their official . . . capacities").  The Court agrees.

"Suits against state officials in their official capacity should be treated as suits against the state."  *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citing *Kentucky v. Graham*, 473 U.S. 159,  166 (1985)); *see also Duncan v. Gunter*, 15 F.3d 989, 991 (10th Cir. 1994) (State officers sued in their official capacity are not "persons" subject to suit under 42 U.S.C. § 1983.).  The doctrine of sovereign immunity bars "a citizen from suing his own State under the federal-question head of [subject-matter] jurisdiction."  *Alden v. Maine*, 527 U.S. 706, 727 (1999) (citing *Hans v. Louisiana*, 134 U.S. 1, 14-15 (1890)); *see generally id.* at 728 (noting that "sovereign immunity derives not from the Eleventh Amendment but from the structure of the original Constitution itself" (citations omitted)).  The doctrine applies whether the relief sought is legal or equitable, *Papasan v. Allain*, 478 U.S. 265, 276 (1986), and it "confers total immunity from suit, not merely a defense to liability," *Ambus v. Granit Bd. of Educ.*, 995 F.2d 992, 994 (10th Cir. 1993).  Accordingly, the Court lacks subject-matter jurisdiction to adjudicate an action brought by a citizen of Colorado against the state of Colorado, its agencies, or its officials in their official capacity.  *Johns v. Stewart*,

57 F.3d 1544, 1552 (10th Cir. 1995).  However, the doctrine of sovereign immunity does not bar "a suit brought in federal court seeking to prospectively enjoin a state official from violating federal law."  *Id.* (citing *Ex parte Young*, 209 U.S. 123, 159-60 (1980)).

In this case, Plaintiff has invoked the Court's subject-matter jurisdiction under 28 U.S.C. § 1343 and 42 U.S.C. § 1983 and requested three types of relief.  *Complaint* [#3] at 4, 12.  The doctrine of sovereign immunity applies to 42 U.S.C. § 1983 actions.  *Quern v. Jordan*, 440 U.S. 332, 345 (1979).  Thus, to the extent that Plaintiff requests compensatory damages and declaratory relief from Defendants in their official capacities, his claims are barred.  To the extent that Plaintiff requests prospective injunctive relief from Defendants in their official capacities, the Court has subject-matter jurisdiction to adjudicate his claims.  Accordingly, the Court recommends that Plaintiff's claims against Defendants in their official capacities seeking declaratory relief and compensatory damages be dismissed without prejudice.  *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) ("[W]here the district court dismisses an action for lack of jurisdiction . . . the dismissal must be without prejudice.").  The Court further recommends that Plaintiff's claims seeking prospective injunctive relief from Defendants in their official capacities should not be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

## B.  Facial Plausibility of Plaintiff's Claims

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants contend that Plaintiff has failed to state a claim upon which relief can be granted.  Defendants raise four specific arguments that Plaintiff's Complaint [#3] fails to state any facially plausible claims: (I) Plaintiff's claims against Defendants Webster and Stock are barred by the statute of limitations; (ii) Plaintiff

failed to allege that Defendant Milyard personally participated in the alleged Eighth Amendment violations; (iii) Plaintiff failed to state an Eighth Amendment claim against Defendants Webster, Stock, Goldsmith, and Fortunato; and (iv) Defendants are entitled to qualified immunity in their individual capacities.  The Court addresses these arguments in turn.

### (i)    Statute of Limitations

Defendants Webster and Stock argue that Plaintiff's claims against them are barred by the statute of limitations.  *Defendant Webster's Motion to Dismiss* [#27] at 5-6; *Other Defendants' Motion to Dismiss* [#20] at 6-7.  "While the statute of limitations is an affirmative defense, the issue may be resolved on a motion to dismiss where the application of the limitations period is apparent on the face of the Complaint."  *Chase v. Cox, et al.*, No. 09-cv-02363, 2010 WL 2692107, at *3 (D. Colo. May 26, 2010) (unreported decision) (citing *Dummar v. Lummis*, 543 F.3d 614, 619 (10th Cir. 2008)).  "Limitations periods in [42 U.S.C.] § 1983 suits are to be determined by reference to the appropriate state statute of limitations and the coordinate tolling rules[.]"  *Hardin v. Straub*, 490 U.S. 536, 539 (1989); *Baker v. Bd. of Regents of State of Kan.*, 991 F.2d 628, 632-33 (10th Cir. 1993) ("The length of the statute of limitations period and related questions of tolling and application are governed by state law, unless the tolling rules are inconsistent with federal law or with the policy which the federal law seeks to implement." (citations omitted)).  In Colorado, actions brought under 42 U.S.C. § 1983 are governed by the two-year statute of limitations codified at Colo. Rev. Stat. § 13-80-102.  *Riel v. Reed*, 760 F. Supp. 852, 854-55 (D. Colo. 1991) (citations omitted).

Although state law provides the limitations period for Section 1983 actions, federal

law specifies when a Section 1983 action accrues.  *Newcomb v. Ingle*, 827 F.2d 675, 678

(10th Cir. 1987) (citations omitted); *see generally Baker*, 991 F.2d at 632 ("Federal law

controls questions relating to accrual of federal causes of action." (citations omitted)).

"Section 1983 claims accrue, for the purpose of the statute of limitations, when the plaintiff

knows or has reason to know of the injury which is the basis of his action."  *Johnson v.

Johnson County Comm'n Bd.*, 925 F.2d 1299, 1301 (10th Cir. 1991).  "A plaintiff has reason

to know of his injury when he should have discovered it through the exercise of reasonable

diligence."  *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 969

(10th Cir. 1994) (citation omitted).  The plaintiff "need not know the full extent of his injuries

before the statute of limitations begins to run."  *Id.* (citations omitted).  Further, "it is not

necessary that [the plaintiff] know all of the evidence ultimately relied on for the cause of

action to accrue."  *Baker*, 991 F.2d at 632 (citation omitted).  When the plaintiff's alleged

injury is a deterioration of his medical condition, the facts that he may be unschooled in

medicine or that the case may be technically complex from a medical standpoint are not

relevant considerations in determining accrual.  *See Cutting ex rel. Cutting v. United States

ex rel. Evans Army Cmty. Hosps., et al.*, No. 07-cv-02053-REB-MEH, 2008 WL 2721787,

at *2 (D. Colo. July 10, 2008) (unreported decision) (citing *United States v. Kubrick*, 444

U.S. 111, 117-18 (1979)).

        In this case, Plaintiff alleges that he first saw Defendant Stock on or about March 14,

2007.  *Complaint* [#3] at 6.  Defendant Stock prescribed Motrin.  *Id.*  Plaintiff saw Defendant

Stock again "about two weeks later," on or about March 28, 2007.  *Id.*  During this

consultation, Defendant Stock administered a cortisone shot.  *Id.*  Plaintiff's Complaint does

not contain any other references to treatment provided by Defendant Stock.  Plaintiff states

in his Complaint that he knew immediately that the diagnosis and treatment he received from Defendant Stock were inadequate. *See id.* (stating that Defendant's Stock's treatment did not relieve the swelling in Plaintiff's back or decrease his pain and limp); *id.* (stating that Plaintiff sought treatment two weeks after seeing Defendant Stock for the last time because his "pain and limp were worse").  Plaintiff therefore knew of the injury that is the basis of his claims against Defendant Stock on or about March 28, 2007.  Accordingly, to the extent that Plaintiff complains about the diagnosis and treatment he received from Defendant Stock, his claims accrued on or about March 28, 2007.  *See Johnson*, 925 F.2d at 1301. Plaintiff's Complaint was not executed until November 17, 2009, and it was not filed until December 30, 2009, which was more than two years after Plaintiff's claims accrued. Plaintiff has not advanced an argument that the limitations period should be tolled, and nothing in the Complaint indicates that tolling is appropriate.  Thus, Plaintiff's claims against Defendant Stock are barred.

Turning to Plaintiff's claims against Defendant Webster, the Court finds that any claims arising from Defendant Webster's conduct *before* Plaintiff's surgery are barred by the statute of limitations, while claims arising from Defendant Webster's conduct *after* the surgery are not.  Plaintiff alleges that he first saw Defendant Webster on or about April 11, 2007.  *Complaint* [#3] at 6.  After this initial consultation, Plaintiff had three more appointments with Defendant Webster before having surgery on May 15, 2008.  *Id.* at 8. The last of these appointments occurred in either October or November 2007.[2]  *Id.*  Over

---

[2] It is not clear from Plaintiff's Complaint whether Defendant Webster actually saw Plaintiff in November of 2007.  Plaintiff states that his sister made several phone calls in October 2007, and "[a]t that point [he] was sent to see Webster again."  *Complaint* [#3] at 8.  Plaintiff then states as follows: "In November of 2007 Webster referred me to Dr. Goldsmith."  *Id.*  It is possible to read Plaintiff's Complaint as alleging that Plaintiff actually met with Defendant Webster for the last time in November 2007.  Whether Plaintiff's final

the course of these appointments, Defendant Webster told Plaintiff that "there was nothing wrong" with him and that he was "faking" his symptoms. *Id.* Again, Plaintiff states in his Complaint that he knew immediately that the diagnosis and treatment he received from Defendant Webster were inadequate. *See id.* ("I asked why I was in such pain and limping if there was nothing wrong with me."); *id.* ("Throughout the month of September I continued to experience increasing back pain and a worsening limp.").  In October 2007, Plaintiff sought help from his sister to obtain "proper medical attention."  *Id.*  This fact clearly establishes that Plaintiff knew of the injury that is the basis of his pre-surgery claims against Defendant Webster in October 2007.  Accordingly, Plaintiff's pre-surgery claims against Defendant Webster accrued in October 2007.  *See Johnson*, 925 F.2d at 1301.  Plaintiff's Complaint was not executed until November 17, 2009, and it was not filed until December 30, 2009, which was more than two years after Plaintiff's claims accrued.  Again, Plaintiff has not advanced an argument that the limitations period should be tolled, and nothing in the Complaint indicates that tolling is appropriate.  Thus, Plaintiff's claims against Defendant Webster arising from Defendant Webster's conduct before Plaintiff underwent surgery are barred.

Plaintiff underwent surgery on May 15, 2008.  *Complaint* [#3] at 9.  After surgery, Plaintiff had two appointments with Defendant Webster.  *Id.* at 7.  At the first appointment, on or about August 27, 2008, Plaintiff complained that his medication "was not helping his back pain at all."  *Id.*  At the second appointment, sometime in October 2008, Plaintiff

---

consultation with Defendant Webster occurred in October or November 2007 is inapposite.  As explained *supra*, Plaintiff's Complaint unequivocally indicates that Plaintiff knew of the injury that is the basis of his pre-surgery claims against Defendant Webster in October 2007.  Accordingly, Plaintiff's pre-surgery claims against Defendant Webster accrued in October 2007.

complained of trouble urinating and Defendant Webster "prescribed a medication which a nurse said would be detrimental to [Plaintiff's] health." *Id.* To the extent that Plaintiff's claims against Defendant Webster arise from the diagnosis and treatment provided at the August and October 2008 appointments, they are not barred by the statute of limitations.

The Court has recognized that "[o]nce a defendant satisfies his initial burden to show that a claim is untimely, the burden shifts to plaintiff to establish a later accrual date or to show that there is a basis to toll the accrual date." *Chase*, 2010 WL 2692107, at *3 (citing *Aldrich v. McCulloch Props. Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980)). As noted above, Plaintiff has neither established a later accrual date nor shown that there is a basis for tolling the accrual date of his claims against Defendant Stock and his pre-surgery claims against Defendant Webster. "[W]hile filing a grievance *may* toll the applicable unexpired statute of limitations pending its resolution," Plaintiff has not alleged that he ever initiated a formal grievance process against Defendant Stock or Defendant Webster. *Id.* (emphasis added) (citing *Roberts v. Barreras*, 484 F.3d 1236, 1238 (10th Cir. 2007)). *But see Rosales v. Ortiz*, 325 F. App'x 695, 699-700 (10th Cir. 2009) (refusing to "carve out an exception" for tolling during the exhaustion of state grievance remedies).

For the foregoing reasons, the Court recommends that Plaintiff's claims against Defendant Stock and pre-surgery claims against Defendant Webster be dismissed with prejudice.

### (ii)    Plaintiff's Claims Against Defendant Milyard

Defendant Milyard contends that Plaintiff's claims against him must be dismissed because Plaintiff failed to allege that he personally participated in the alleged Eighth Amendment violations. *Other Defendants' Motion to Dismiss* [#20] at 7-9. Defendant

-14-

Milyard argues that Plaintiff "did not provide sufficient facts to allow the Court to draw the reasonable inference that [he] participated in or acquiesced in the alleged violations associated with [Plaintiff's] medical care."  *Id.* at 8.

Defendant Milyard is the warden at Sterling, and Plaintiff's Complaint mentions him just twice.  First, Plaintiff alleges that his sister, Carol Capuano, spoke to Defendant Milyard on the telephone in October 2007.  *Complaint* [#3] at 8.  Ms. Capuano asked Defendant Milyard to help get Plaintiff "proper medical attention," but he did not do "anything to help." *Id.*  Plaintiff mentions Defendant Milyard a second time at the end of his allegations: "I experienced months of pain and suffering, permanent damage and paralysis because . . . Warden Milyard . . . did not allow or provide me with proper medical care."  *Id.* at 9.

"Individual liability under [42 U.S.C.] § 1983 must be based on personal involvement in the alleged constitutional violation."  *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) (citing *Grimsley v. MacKay*, 93 F.3d 676, 679 (10th Cir. 1996)); *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976) ("Personal participation is an essential allegation in a Section 1983 claim." (citations omitted)).  A defendant is personally involved in an alleged constitutional violation only if there is an "affirmative link" between his conduct and the alleged violation.  *Stidham v. Peace Officer Stds. & Training*, 265 F.3d 1144, 1156 (10th Cir. 2001).  Because of the "affirmative link" requirement, a defendant in a position of general supervisory authority cannot be held vicariously liable for alleged constitutional violations committed by his subordinates.  *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996) ("[S]upervisor status by itself is insufficient to support liability." (citing *Rizzo v. Goode*, 423 U.S. 362, 376 (1976))); *Ruark v. Solano*, 928 F.2d 947, 950 (10th Cir. 1991) ("'[T]here is no concept of strict supervisor liability under section 1983.'" (quoting *Harris v.*

-15-

*Greer*, 750 F.2d 617, 618 (7th Cir. 1984))); *McKee v. Heggy*, 703 F.2d 479, 483 (10th Cir. 1983) ("A defendant cannot be liable under a *respondeat superior* theory in a section 1983 case." (citing *McClelland v. Facteau*, 610 F.2d 693 (10th Cir. 1979))); *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006) ("Supervisors are only liable under § 1983 for their own culpable involvement in the violation of a person's constitutional rights.").

Courts have explained that a defendant in a supervisory position is personally involved in an alleged constitutional violation committed by his subordinates in two situations.   First, the supervisor is personally involved when he personally directs his subordinates to take the action resulting in the alleged constitutional violation.  *Woodward v. City of Worland*, 977 F.2d 1392, 1400 (10th Cir. 1992).   Second, the supervisor is personally involved when he has actual knowledge that his subordinates are committing the alleged constitutional violation and he acquiesces in its commission.  *Id.* (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990) (Supervisor liability requires "allegations of personal direction or of actual knowledge and acquiescence."));  *see also id.* at 1399 n.11 (To show an affirmative link between the defendant supervisor's conduct and unconstitutional behavior by his subordinates, a plaintiff must establish "an intentional, conscious, and deliberate act by the defendant participating in, or knowingly acquiescing in, the unconstitutional behavior.").   The Court of Appeals for the Tenth Circuit has explained personal involvement by knowing acquiescence as follows: "In this context, the supervisor's state of mind is a critical bridge between the conduct of a subordinate and his own behavior."   *Serna*, 455 F.3d at 1151.

The Supreme Court has recently called into question the notion of personal involvement by knowing acquiescence.  In *Ashcroft v. Iqbal*, 129 S. Ct. at 1949, the Court

suggested that the simple fact that a supervisor knew of and acquiesced in a constitutional violation committed by his subordinates does not establish that he was personally involved in the violation.   In *Iqbal*, the Court considered a federal detainee's claim that his designation as "a person of high interest" was the result of unconstitutional discrimination on the basis of his race, religion, or national origin.   *Id.* at 1944.   The detainee asserted his discrimination claim against, *inter alios*, the Attorney General of the United States and the Director of the Federal Bureau of Investigation (FBI).   *Id.*   He argued that these senior officials established the policy and procedures implemented by the prison officials who actually made the allegedly discriminatory designation.   *Id.* ("The pleading names [former Attorney General] Ashcroft as the 'principal architect' of the policy, and identifies [Director of the FBI] Mueller as 'instrumental in its adoption, promulgation, and implementation.'" (citations omitted)).   The Supreme Court held as follows:

> [Respondent] argues that, under a theory of "supervisory liability," petitioners can be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees." That is to say, respondent believes a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.   We reject this argument.   Respondent's conception of "supervisory liability" is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents.   In a § 1983 suit or a *Bivens* action–where masters do not answer for the torts of their servants–the term "supervisory liability" is a misnomer.   Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.   In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

*Id.* at 1949.

*Iqbal* has been interpreted by at least two Courts of Appeals as narrowing the scope

of what constitutes "personal involvement" by a supervisor in an alleged constitutional violation committed by his subordinates:

> [G]iven a recent Supreme Court pronouncement, the basic concept of § 1983 . . . supervisory liability itself may no longer be tenable. *See Iqbal*, 129 S. Ct. at 1949 ("In a § 1983 suit or a *Bivens* action–where masters do not answer for the torts of their servants–the term 'supervisory liability' is a misnomer."). After *Iqbal*, circuits that had held supervisors liable when they knew of and acquiesced in the unconstitutional conduct of subordinates have expressed some doubt over the continuing validity of even that limited form of liability. *See Bayer v. Monroe County Children & Youth Servs.*, 577 F.3d 186, 190 n.5 (3d Cir. 2009); *Maldonado v. Fontanes*, 568 F.3d 263, 274 n.7 (1st Cir. 2009).

*Arocho v. Nafziger*, 367 F. App'x 942, 947 n.4 (10th Cir. 2010).  Accordingly, to establish that a defendant in a supervisory position was personally involved in an alleged constitutional violation committed by his subordinates, a plaintiff must show that the defendant did more than simply acquiesce in the violation.[3]

In this case, Plaintiff has failed to allege any personal involvement by Defendant Milyard in denying him medical care beyond simple acquiescence to the actions of medical staff at Sterling.  Plaintiff's Complaint does not contain factual allegations sufficient to plausibly suggest that Defendant Milyard had either a "purpose" to deny Plaintiff proper medical care, *see Iqbal*, 129 S. Ct. at 1949 , or a "state of mind" similar to that of his subordinates who allegedly were deliberately indifferent to Plaintiff's medical needs, *see*

---

[3] The Courts of Appeals have not provided clear guidance regarding precisely what a plaintiff must show to demonstrate more than mere acquiescence by the defendant. But *Iqbal* and *Serna* indicate that the defendant's state of mind is the linchpin of the analysis.  In *Iqbal*, the Supreme Court suggested that a defendant who acquiesces in a constitutional violation committed by his subordinates is personally involved in the violation only if his acquiescence was motivated by a "purpose" to allow or further the violation.  *See* 129 S. Ct. at 1949.  In *Serna*, the Court of Appeals for the Tenth Circuit suggested that a defendant supervisor who acquiesces in a constitutional violation is personally involved in that violation only if he shares the same "state of mind" with his subordinates who actually commit the violation.  *See* 455 F.3d at 1151.

*Serna*, 455 F.3d at 1151.  *See also* n.3, *infra*.  Plaintiff has merely alleged that (1) Defendant Milyard knew that he was complaining about the quality of his medical treatment, and (2) Defendant Milyard did not do "anything to help."  *Complaint* [#3] at 8.  These allegations are insufficient to state a claim against Defendant Milyard.  *See Davis v. Ark. Valley Corr. Facility*, 99 F. App'x 838, 843 (10th Cir. 2004) ("Copying [the prison warden] with correspondence outlining [plaintiff's] complaints about medical care, without more, does not sufficiently implicate the warden under § 1983."); *accord Crowder v. Lash*, 687 F.2d 966, 1005-06 (7th Cir. 1982) (A Commissioner of Corrections who has been informed by Plaintiff both personally and by letter of alleged constitutional violations committed by prison officers was not personally involved in the violations because to find otherwise "would be to hold any well informed Commissioner of Corrections personally liable for damages flowing from any constitutional violation occurring at any jail within that Commissioner's jurisdiction. . . . [S]uch a broad theory of liability is inconsistent with the personal responsibility requirement for assessing damages against public officials in a section 1983 action.").  Accordingly, the Court recommends that Plaintiff's claims against Defendant Milyard be dismissed with prejudice.

### (iii)    Plaintiff's Claims Against Defendants Webster, Stock, Goldsmith, and Fortunato

Defendants Webster, Stock, Goldsmith, and Fortunato contend that Plaintiff's Complaint [#3] fails to state a claim that they violated the Eighth Amendment.  *Defendant Webster's Motion to Dismiss* [#27] at 6; *Other Defendants' Motion to Dismiss* [#20] at 9.  They argue that Plaintiff has failed to allege that they acted in a manner "'sufficiently harmful to evidence deliberate indifference to serious medical needs.'"  *Id.* (quoting *Estelle*

*v. Gamble*, 429 U.S. 97, 106 (1976)).

The Eighth Amendment to the United States Constitution provides that "cruel and unusual punishments" shall not be inflicted.  U.S. Const. amend. VIII.  Punishments which "involve the unnecessary and wanton infliction of pain" violate this provision.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  Because "[a]n inmate must rely on prison authorities to treat his medical needs," *Estelle*, 429 U.S. at 103, the Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment," *id.* at 104 (quoting *Gregg*, 428 U.S. at 173).  To prove a claim of deliberate indifference, a prisoner must establish that (1) he was deprived of a medical need that is, objectively, "sufficiently serious," *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), and (2) the defendant knew of and disregarded "an excessive risk to [the prisoner's] health or safety," *id.* at 837.  "A medical need is sufficiently serious if it is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (quoting *Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D.C.N.H. 1977)).  A defendant knew of and disregarded an excessive risk to a prisoner's health or safety when he was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he actually drew that inference.  *Farmer*, 511 U.S. at 837.

Importantly, "it is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  Thus, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of

medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106; *see also Ramos,* 639 F.2d at 575 ("[A] mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment."). Further, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106; *see also Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) ("A negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation."). Finally, a prisoner does not have a valid claim of deliberate indifference simply because he was denied "a particular course of treatment" that he desired. *Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006). "[A] prison doctor remains free to exercise his or her independent professional judgment," *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997), and "[m]edical decisions that may be characterized as 'classic examples of matters for medical judgment,' such as whether one course of treatment is preferable to another, are beyond the [Eighth] Amendment's purview," *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) (quoting *Estelle*, 429 U.S. at 107).

In this case, Plaintiff alleges deliberate indifference on the part of Defendants Webster, Stock, Goldsmith, and Fortunato. For the sole purpose of resolving the Motions to Dismiss, Defendants Webster, Stock, and Goldsmith concede that Plaintiff's Complaint alleges that Plaintiff had a sufficiently serious medical need during the period they were responsible for treating him. *Defendant Webster's Motion to Dismiss* [#27] at 7; *Other Defendants' Motion to Dismiss* [#20] at 10 n.3. The Court considers Plaintiff's claims against each Defendant in turn.

### a.    Defendant Webster

The Court has already found, *supra* in Part III.B(i) of this Recommendation, that Plaintiff's claims against Defendant Webster arising from his conduct prior to Plaintiff's surgery are barred by the statute of limitations.  The Court now finds that Plaintiff has failed to state an Eighth Amendment claim against Defendant Webster arising from any of his pre-surgery or post-surgery conduct.  Plaintiff alleges that he had four appointments with Defendant Webster during the period from on or about April 11, 2007 through October or November 2007.  *Complaint* [#3] at 6-8; *see* n.2, *supra*.  Plaintiff also alleges that he had two appointments with Defendant Webster after he underwent surgery on May 15, 2008.  *Id.* at 7.  Even if it is assumed that Defendant Webster misdiagnosed Plaintiff and provided him with inadequate care at every appointment, the Complaint does not allege facts that plausibly give rise to an inference that Defendant Webster knew of and consciously disregarded an excessive risk to Plaintiff's health and safety.  *See Farmer*, 511 U.S. at 837; *Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").  Accordingly, Plaintiff has not sufficiently pled a viable claim against Defendant Webster.  The Court recommends that Plaintiff's claim against Defendant Webster be dismissed with prejudice.

### b.    Defendant Stock

Again, the Court has already found, *supra* in Part III.B(i) of this Recommendation, that Plaintiff's claims against Defendant Stock are barred by the statute of limitations.  Nevertheless, the Court also finds that Plaintiff has failed to state an Eighth Amendment claim against Defendant Stock.  Plaintiff alleges that he first saw Defendant Stock on or

about March 14, 2007. *Complaint* [#3] at 6. Defendant Stock prescribed Motrin. *Id.* Plaintiff saw Defendant Stock again "about two weeks later," on or about March 28, 2007. *Id.* During this appointment, Defendant Stock administered a cortisone shot. *Id.* Plaintiff's Complaint does not contain any other references to treatment provided by Defendant Stock. Even if it is assumed that Defendant Stock misdiagnosed Plaintiff and provided him with inadequate care, the Complaint does not allege facts that plausibly give rise to an inference that Defendant Stock knew of and consciously disregarded an excessive risk to Plaintiff's health and safety. *See Farmer*, 511 U.S. at 837. Accordingly, Plaintiff has not sufficiently pled a viable claim against Defendant Stock. The Court recommends that Plaintiff's claim against Defendant Stock be dismissed with prejudice.

### c. Defendant Goldsmith

Plaintiff alleges that he saw Defendant Goldsmith on three occasions during the period from November 2007 to January 2008. *Complaint* [#3] at 8. Over the course of these appointments, Defendant Goldsmith prescribed Baclofen, ordered MRI, and referred Plaintiff for an appointment with a specialist at Denver Health. *Id.* at 8-9. As an initial matter, it appears to the Court that Defendant Goldsmith acted reasonably and appropriately escalated the course of diagnostic testing and treatment. Moreover, even if it is assumed that Defendant Goldsmith misdiagnosed Plaintiff, provided him with inadequate care, or delayed referring him to a specialist, the Complaint does not allege facts that plausibly give rise to an inference that Defendant Goldsmith knew of and consciously disregarded an excessive risk to Plaintiff's health and safety. *See Farmer*, 511 U.S. at 837. The Complaint does not allege that Defendant Goldsmith disregarded Plaintiff's medical problems at all. Instead, the Complaint alleges that as soon as

-23-

Defendant Goldsmith reviewed Plaintiff's MRI results and thus became aware of the potential severity of Plaintiff's condition, he decided to refer Plaintiff to a specialist. *Complaint* [#3] at 8.   This conduct makes it impossible to conclude that Defendant Goldsmith was deliberately indifferent to Plaintiff's medical needs.   Accordingly, Plaintiff has not sufficiently pled a viable claim against Defendant Goldsmith.   The Court recommends that Plaintiff's claim against Defendant Goldsmith be dismissed with prejudice.

### d.    Defendant Fortunato

Plaintiff alleges that he did not receive "proper rehabilitative therapy" and equipment from Defendant Fortunato after his surgery.   *Id.* at 11.   Plaintiff alleges that Defendant Fortunato denied him proper care on four occasions.   First, Plaintiff alleges that Defendant Fortunato refused to give him a wheelchair on or about July 25, 2008.   *Id.* at 7.   Plaintiff explains that he needed a wheelchair because he "was blown to the ground by a strong gust of wind" on or about July 11 or 12, 2008.   *Id.*   Plaintiff states that the fall caused him to have "progressively more trouble keeping [his] balance and walking."   *Id.*   Second, Plaintiff alleges that during an appointment on January 16, 2009, Defendant Fortunato refused to discuss or treat seizures that Plaintiff had been experiencing. *Id.*   Plaintiff explains that his "body seized up and gave out on" him four times during the period from his surgery to on or about January 10, 2009.   *Id.*   Plaintiff states that "the seizing was never treated."   *Id.*   Third, Plaintiff alleges that Defendant Fortunato failed to provide any "help" during an appointment in January 2009 for his loss of strength and dexterity in his left hand and his problems defecating.   *Id.* at 11.   Finally, Plaintiff alleges that Defendant Fortunato denied his request for a renewal of his Darvocet prescription.   *Id.*

Even if it is assumed that Defendant Fortunato provided Plaintiff with inadequate

care, the Complaint does not allege facts that plausibly give rise to an inference that Defendant Fortunato knew of and consciously disregarded an excessive risk to Plaintiff's health and safety.  *See Farmer*, 511 U.S. at 837.  Plaintiff has pled facts that establish only that he disagreed with Defendant Fortunato's treatment decisions.  These facts are not enough to make Plaintiff's Eighth Amendment claim against Defendant Fortunato plausible. *See Callahan*, 471 F.3d at 1161; *Dulany*, 132 F.3d at 1240; *Ramos*, 639 F.2d at 575. Accordingly, the Court recommends that Plaintiff's claim against Defendant Fortunato be dismissed with prejudice.

### (iv)    Defendants' Qualified Immunity

Because the Court has already recommended that all of Plaintiff's claims against Defendants in their individual capacities should be dismissed, there is no need to consider Defendants' contention that they are entitled to qualified immunity.  *Sannah v. Howell*, No. 08-cv-02117-REB-KLM, 2009 WL 3273459, at *9 (D. Colo. Sept. 14, 2009) (unreported decision) ("[G]iven that plaintiff has failed to plead any plausible Eighth Amendment injuries, it is unnecessary to address whether defendants are entitled to qualified immunity." (citing *Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1214 (10th Cir. 2006); *Stine v. Lappin*, No. 07-cv-01839-WYD-KLM, 2009 WL 103659, at *15 (D. Colo. Jan. 14, 2009) (unreported decision))).

### C.    Plaintiff's Request for Injunctive Relief

Plaintiff requests "injunctive relief ordering proper medical care and rehabilitation." *Complaint* [#3] at 12.  As stated *supra* in Part III.A of this Recommendation, the Court has subject-matter jurisdiction over Plaintiff's claim for prospective injunctive relief from Defendants in their official capacities. *See Ex parte Young*, 209 U.S. at 159-60.  The Court

finds that Plaintiff has failed to plausibly allege an ongoing or potential future constitutional violation by any Defendant.  Plaintiff's specific allegations against each Defendant have been thoroughly discussed and found lacking.  Accordingly, the Court recommends that Plaintiff's claims for prospective injunctive relief from Defendants in their official capacities be dismissed with prejudice.  *See Abu-Fakher v. Bode*, 175 F. App'x 179, 181-82 (10th Cir. Mar. 16, 2006) (holding that a prisoner's entitlement to injunctive relief was reliant upon his ability "to state a claim for an Eighth Amendment violation").

## IV.  Conclusion

For the foregoing reasons, I respectfully **RECOMMEND** that Defendants' **Motions to Dismiss** [#20 and 27] be **GRANTED**.  Accordingly,

I FURTHER **RECOMMEND** that this case be **DISMISSED with prejudice**.

IT IS HEREBY **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review.  *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated:  December 20, 2010

BY THE COURT:

 s/ Kristen L.  Mix
Kristen L.  Mix
United States Magistrate Judge